UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICE BROWN,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF CRESCENT CITY, et al.,<br><br>　　　　　Defendants. | Case No. 18-cv-07826-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 103 |

　　　　Plaintiff Alice Brown initiated this suit against multiple defendants, including Crescent City and several of its employees after she was subject to a traffic stop early in the morning of January 1, 2018. Ms. Brown asserts, *inter alia*, that there was no probable cause to support the traffic stop, that she was racially profiled, and that the stop deprived her of the right to travel. At the time that Ms. Brown filed suit, she was pro se. However, in August 2020, counsel made an appearance to represent her.

　　　　Currently pending before the Court is a motion for summary judgment filed by the defendants who remain in the case: Crescent City, Eric Wier (the City Manager), the Crescent City Police Department ("CCPD"), Ethan Miller (the officer who stopped Ms. Brown), and Ivan Minsal (the Chief of Police). In the motion, Defendants make two arguments: (1) there is no genuine dispute that there is insufficient evidence to support a claim of racial profiling; and (2) there is no genuine dispute that there is insufficient evidence to support a *Monell* claim against the City and/or a supervisory claim against the individual defendants.

　　　　Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** the motion for summary judgment.

## I. FACTUAL & PROCEDURAL BACKGROUND

In her complaint, which she filed while she was still proceeding pro se, Ms. Brown asserted the following claims for relief:

(1) Violation of the Fourth Amendment (unlawful seizure and detention).

(2) Violation of the Fifth Amendment (denial of the right to travel without due process).

(3) Violation of the Fourteenth Amendment (denial of the right to life, liberty, and the pursuit of happiness without due process).

(4) *Monell* liability.

(5) Defamation.

*See* Compl. In September 2021, Ms. Brown stipulated to the dismissal of the defamation claim. *See* Docket No. 102 (stipulation and order).

In the pending motion, Defendants do not challenge (at this point) the claims related to the contention that Ms. Brown was stopped by the police without probable cause. However, Defendants argue that any claim of racial profiling, *see* Compl. at 6 (although not specified clearly as a cause of action, alleging that "I was racially profiled and due to my race being 'Black' was treated like a common 'n—' crook"), should be dismissed, as should any claim based on *Monell* or supervisory liability.

The evidence submitted by the parties in conjunction with their briefs reflects as follows.

Ms. Brown is a Black woman. *See* Brown Depo. at 22.

At about 3:27 a.m. on January 1, 2018 (*i.e.*, New Year's Day), Officer Miller of the CCPD initiated a traffic stop of Ms. Brown while she was driving in Crescent City. The stop lasted somewhere between 7-19 minutes. *See* Miller Decl. ¶ 4 (testifying that, based on his body camera video, "from the time I first approached Ms. Brown's car until I started to return to my own vehicle after releasing [Ms.] Brown, Ms. Brown's traffic stop . . . was less than seven minutes"); Healy Decl., Ex. C (police report) (reflecting start time of 3:27 a.m. and clearing time 19 minutes later). In her deposition, Ms. Brown described the circumstances leading up to the traffic stop as follows.

2

1       On the evening of December 31, 2017 (*i.e.*, New Year's Eve), Ms. Brown went to two
2  casinos to celebrate.  *See* Brown Depo. at 12.  After midnight, the party ended, and Ms. Brown
3  went to the post office in Crescent City to pick up her mail.  She then sat in her parked car, which
4  was located near a park facing the ocean, to look at her mail, send some texts, and make phone
5  calls.  *See* Brown Depo. at 11-12.  She did not have any drink during this entire time.  *See* Brown
6  Depo. at 12.
7       According to Ms. Brown, when she left the parking lot, she started on H Street and then
8  made a right onto Front Street.  *See* Brown Depo. at 14.  Front Street intersects with Highway 101
9  – in two places because there is a one-way southbound 101 (also known as L Street) and a one-
10 way northbound 101 (also known as M Street).  Below is a map provided by Defendants of the
11 area.[1]



Kelley Decl., Ex. A (map)

It appears that there is a stop sign or stop light where Front Street intersects northbound
101.  Ms. Brown stopped at that intersection.  While she was stopped, she saw a CCPD police car

---

[1] The Court agrees with Defendants that it may take judicial notice of the map.

3

pass behind her on southbound 101. She then made a left from Front Street onto northbound 101. From her rear view mirror, she saw the police car "make a U-turn at the end of the S [curve] . . . and then [the officer] sped up upon [her], followed [her] until Seventh Street," and then pulled her over. Brown Depo. at 15.

Because she had seen the police car while she was at the intersection of Front Street and northbound 101, she purposefully "went five miles below the speed limit," *i.e.*, 25 miles per hour instead of 30, before she was stopped by the police car. Brown Depo. at 16. And according to Ms. Brown, during this time, her driving was not erratic either – specifically, at no point did the tires of her car go into the "gutter pan" of the road. *See* Brown Depo. at 17. Thus, there was no reason for Officer Miller to initiate the traffic stop. Notably, Ms. Brown was never cited for a traffic violation. *See* Healy Decl., Ex. C (police report) (in narrative, stating that "[Ms.] Brown was arguementative [sic] and unhappy with being stopped[;] [she] admitted to driving 5 miles under the speed limit" but "[s]he did not apear [sic] to be under the influence or imapaird [sic] and was not cited for the above listed traffic violations").

Ms. Brown indicates that the reason why she was stopped was because of her race – *i.e.*, because she is Black. In her deposition, she suggested that Officer Miller knew of her race based on one or both of the following:

- The CCPD knew she was Black because officers were familiar with her car, having previously stopped her three or four times and conducted a warrant check. *See* Brown Depo. at 18 ("I feel that the officer saw my car, that's why he made the U-turn, and because I have had contact with the Crescent City police, they know my car. They called my license plate in numerous times. They did a warrant check on me numerous times. They know my car. They know my license plate number."); Brown Depo. at 18 ("The contacts I've had with the police is when I've been parked, completely still with the vehicle turned off. . . . It happened maybe three, four times, and at that time I couldn't have remember if it was Officer Miller or not."); Brown Depo. at 19 ("[E]very time I have contact with police, they put my race down or spoken to the dispatcher as Black, so they knew the person in that car,

4

my 1999 blue Ford Taurus, was a Black woman."); Brown Depo. at 21 ("I believe that Crescent City police knows that that car belongs to me, a Black woman."); Brown Depo. at 21-22 ("I know from the police report [Officer Miller] knew my race was Black. . . . He put my race down as Black. . . . I don't think [my driver's license] has a race on it."[2]); Brown Depo. at 22 ("He knew my race was Black from prior encounters with the Crescent City police. . . . I believe he knew my race was Black because of my car.").

- While she was driving her car, Officer Miller was in close enough proximity to have seen she is Black, and the lighting was sufficient for him to have had a visual. *See* Brown Depo. at 25 ("[I]f you're asking if there was enough light, yes. If you're asking if the distance was close enough, yes. In Crescent City, the blocks are very, very small, I would say maybe 30 to 40 feet away."); Brown Depo. at 25-26 ("He could have been the vehicle as he passed by me, but as he entered the S, he could have also seen from the side because the S-curve goes toward my vehicle where I'm sitting at a stop sign where you can see through my side window and see me and then I made the left turn."); Brown Depo. at 28 ("[The lights inside the car were] [my] headlights, my dashboard lights, my radio light. Those lights.").

In his deposition, Officer Miller testified that he stopped Ms. Brown on the basis that she was "[u]nable to maintain her lane as well as fluctuation of speed." Miller Depo. at 11. This was consistent with the police report that he completed. *See* Healy Decl., Ex. C ("Remarks: Remarks: 1195 on CA 7JOS960 CVC [Cal. Veh. Code] 21658 and CVC 22400. Vehicle fluctuated between 20-30 mph in 30 mph zone. Vehicle veered to left almost hitting west curb while N/B 300/400 blk M St. CONT."). Regarding speed, Officer Miller stated at his deposition that, even though Ms. Brown was driving under the speed limit, that did not mean she was "inherently" operating her car lawfully: "[W]hen you're driving on the road and a vehicle in front of you fluctuates upwards of between 10 miles per hour up and down, that's an unsafe fluctuation. You're constantly

---

[2] Ms. Brown's driver's licenses can be found at Exhibit B to the Healy Declaration. They do not state her race.

5

accelerating and braking to keep your distances appropriate." Miller Depo. at 12-13. Regarding the lane, Officer Miller testified that Ms. Brown "went off the road to the left in between the 300 and 400 block," with both of her tires going into the gutter pan and then made a "sharp correction back onto the road." Miller Depo. at 16-17.

In a declaration submitted in support of the motion for summary judgment, Officer Miller also testified that, before he pulled Ms. Brown over and walked up to her driver's side window, he "had no idea who I was pulling over, their race or gender" because "it was dark" and the light outside the car and inside the car did not make "the driver visible enough for me to determine the driver's race or gender prior to the stop." Miller Decl. ¶ 3. Officer Miller also stated that, prior to the traffic stop, he was "unfamiliar with the specific car [Ms.] Brown drove." Miller Decl. ¶ 3.

## II. DISCUSSION

A. Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant

judgment in his favor") (emphasis omitted).

B.     Claim for Racial Profiling

Defendants argue that any claim Ms. Brown has for racial profiling (*i.e.*, an equal protection violation) is not viable based on *Bingham v. City of Manhattan Beach*, 341 F.3d 939 (9th Cir. 2002), *overruled in part on other grounds by Edgerly v. City & County of San Francisco*, 599 F.3d 946, 956 n.14 (9th Cir. 2010). Because *Bingham* is a significant case, the Court briefly discusses it below.

The plaintiff in *Bingham* was a 62-year-old Black photographer whose work had appeared in major magazines such as *Time* and *Newsweek*. He had no criminal record. According to the plaintiff, while he was driving in Manhattan Beach, California, in a safe and lawful manner, a white police officer began to follow him in a patrol car. After many blocks, the officer pulled the plaintiff over. The plaintiff asserted several claims, including one for equal protection – *i.e.*, that he was targeted for a traffic stop because of his race. *See id.* at 944. According to the police officer, he initiated a traffic stop of the plaintiff not because he is Black but because he had been driving erratically – *e.g.*, drifting between lanes – which led the officer to suspect that the plaintiff was drunk. The parties disputed whether the officer could see the plaintiff – specifically, his race – before the plaintiff was pulled over. *See id.* at 943.

The lower court granted summary judgment in favor of the officer on the equal protection claim. On appeal, the Ninth Circuit affirmed. The court acknowledged that, because of the procedural posture of the case (summary judgment), it had to construe the facts in the light most favorable to the plaintiff: specifically, that the plaintiff was "driving safely," that the officer was able to see the plaintiff's race, that Manhattan Beach is "predominantly white," that the officer "pulled [the plaintiff] over after following him for several miles, even though [the plaintiff] had broken no traffic rules," and that the plaintiff was "never issued a citation for [erratic driving]." *Id.* at 946, 948. The Ninth Circuit nevertheless held that there was insufficient evidence to show that race motivated the officer's stop of the plaintiff.

> Essentially, Bingham argues that because he is African-American, the officer is white, and they disagree about the reasonableness of the traffic stop, these circumstances are sufficient to raise an

7

>inference of racial discrimination. We disagree that this is sufficient to state an equal protection claim. To avoid summary judgment, Bingham "must 'produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [the] decision . . . was racially motivated.'" *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 754 (9th Cir. 2001) (quoting FDIC v. Henderson, 940 F.2d 465, 473 (9th Cir. 1991)) (alterations in original); *cf. Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995) (stating that "a long line of Supreme Court cases make clear that the Equal Protection Clause requires proof of discriminatory intent or motive"). Because Bingham has failed to produce any evidence of discriminatory intent, he has not created a genuine issue of fact as to whether Schreiber's actions violated the Equal Protection Clause.

*Id.* a 948-49.

Judge Reinhardt concurred with the holding on the equal protection claim, noting as follows:

>We must . . . accept as true Bingham's assertion that he was not driving erratically, as well as his inference that erratic driving was not the reason for the stop. . . .
>
>Although we must assume that erratic driving was not the reason for the stop, Bingham does not provide any evidence to show that the real reason was his race. He does not, for example, provide statistics or other evidence to show that the Manhattan Beach Police Department, or Schreiber in particular, had a practice of stopping African Americans; he does not contend that Schreiber made any race-related comment when making the stop; and he does not assert that similarly situated white drivers were not stopped. I am aware that evidence is often difficult or even impossible to produce in racial profiling cases, and its absence here does not prove that Bingham is wrong as to the reason he was stopped. As we have noted, it is clear . . . that African-Americans are stopped by the police in disproportionate numbers." *Washington v. Lambert*, 98 F.3d 1181, 1182 n.1 (9th Cir. 1996). "Driving while black" did not become a commonplace phrase in our society without good reason. The conclusion Bingham draws is, therefore, understanable. Nevertheless, in the absence of some tangible evidence in the record that tends to support his conclusion, we are compelled by precedent to grant summary judgment to the defendants. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

*Id.* at 953-54 (Reinhardt, J., concurring); *see also Benson v. City of San Jose*, 583 F. App'x 604, 606 (9th Cir. 2014) (stating that, "[a]s in *Bingham*, Benson failed to produce 'some tangible evidence in the record that tends to support his conclusion' that the seizure was racially motivated – evidence, for instance, that Pettis or the San Jose Police Department had a practice, or engaged in a pattern, of seizing African-Americans or that Pettis made a race-related remark during the

8

encounter."); *cf. Bey v. Falk*, 946 F.3d 304, 320 (6th Cir. 2019) (noting that "an officer's lack of reasonable suspicion (or probable cause) may be relevant to the question whether the officer acted with a racially discriminatory intent[,] [b]ut a lack of reasonable suspicion alone is insufficient to show such intent"); *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003) (agreeing with the Seventh Circuit that "'[w]e do not think . . . that the combination of an arbitrary stop . . . with a difference in race between the person stopped and the officer establishes a prima facie case of racial discrimination'"); *Orellana v. Cty. of Los Angeles*, No. CV 12-01944 MMM (CWx), 2013 U.S. Dist. LEXIS 198186, at *45 (C.D. Cal. Apr. 29, 2013) (indicating that "'[p]robable cause does not mean lack of discriminatory intent any more than lack of probable cause means racially-based animus'").

The question in the instant case is whether Ms. Brown has essentially made out only a *Bingham* case or something more. The Court finds that this case is largely the same as *Bingham*. Even if the Court credits Ms. Brown's assertion that Crescent City is a "mostly white community," Opp'n at 3; *see also Bingham*, 341 F.3d at 948 n.8 (noting that there was no evidence in the record as to whether Manhattan Beach was predominantly white, but adding that "counsel's assertion is supported by census data"), Ms. Brown has not pointed to evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that Officer Miller's decision to stop her was racially motivated. This is true even assuming, in her favor, that the officer knew of her race at the time he spotted her[3] and that there was no basis for stopping her, as in *Bingham*, this was not enough to sustain a claim of racial profiling without something more.

Ms. Brown claims that she was "routinely" targeted by the police due to her race. Opp'n at 3. Presumably, Ms. Brown is referring to the three or four times that the police previously stopped her and conducted a warrant check. The problem for Ms. Brown is that this evidence, by itself, is not enough to show a practice on the part of the police to stop Black people based on their race. The record contains no information about any of the circumstances regarding these prior incidents.

---

[3] Although it seems questionable that Officer Miller knew of Ms. Brown's race because the police (allegedly) were familiar with her car, there is a genuine dispute of fact as to whether he could have seen her race when he made the U turn to follow her.

1   Furthermore, there is no indication that Officer Miller himself was involved in any of these prior
2   incidents.
3          Ms. Brown also points to the fact that Officer Miller identified her as Black on the police
4   report.  *See* Opp'n at 4.  She argues that her race was entirely irrelevant, and therefore the fact that
5   the officer included her race on the report (especially when her race was not listed on her driver's
6   license) is probative of a discriminatory intent.  The Court does not agree.  Officer Miller did not
7   simply make note of Ms. Brown's race; he also listed other identifying factors such as gender,
8   height, weight, hair color, and eye color.  *See* Healy Decl., Ex. C (police report).  Ms. Brown
9   points out that the police report required the officer to state her height, weight, hair color, and eye
10  color but that there was no such requirement for the officer to list her race.  Although this seems to
11  be true, there was also no requirement that the officer specify her gender either.  At bottom, there
12  is a reason for a police report to describe the individual who is the subject of the report, and it is
13  not surprising for identification to include a person's physical characteristics such as race and
14  gender.
15         Ms. Brown further cites Exhibit G to the Healy declaration – *i.e.*, an alleged police log –
16  contending that it "corroborate[s] [her] testimony that law enforcement pulls over citizens and
17  detains them without probable cause or reasonable justification."  Opp'n at 5.  But the issue here is
18  whether there was a discriminatory motive.  Nothing about the log sheds light on the race of those
19  people who were stopped.
20         Finally, Ms. Brown contends that Officer Miller "apparently has posted matters on
21  Facebook 'concerning' [B]lack people."  Opp'n at 7.  But Officer Miller's deposition testimony,
22  on which Ms. Brown relies, does not support this claim.  In his deposition, Officer Miller testified
23  that, in participating in social media, he has not posted jokes concerning Black people.  *See* 2d
24  Miller Depo. at 47.  Also, he has not "liked or shared any social media posts in which one would
25  call a Black joke or jokes about Black people."  2d Miller Depo. at 48.  Officer Miller further
26  testified that he had not scrubbed, deleted, or removed from any website any "shares, likes, or
27  posts concerning Black people."  2d Miller Depo. at 53.  To the extent Ms. Brown relies on page
28  48, line 3 of Officer Miller's deposition testimony, Ms. Brown has mischaracterized the testimony.

It is clear that Officer Miller was only asking a clarifying question. *See* 2d Miller Depo. at 48.

To the extent Ms. Brown cites *Price v. Kramer*, 200 F.3d 1237 (9th Cir. 2000), to support her position, the case is easily distinguishable based on the facts. There, the plaintiffs were three teenage boys, two Black and one White, who were stopped by the police for purported traffic violations. The plaintiffs alleged, *inter alia*, that the stop and the police officers' conduct toward them was the result of racial bias. The jury found in the plaintiffs' favor. On appeal the Ninth Circuit took note that the plaintiffs' racial bias theory was supported by the fact that the officers decided to make a U-turn and follow the plaintiffs' car even though "all they had seen were two young African American makes driving down a major boulevard in an unremarkable manner." *Id.* at 1251. (The white teenage boy had been lying down in the car and so was not visible.) However, there was notably more evidence to support the plaintiffs' theory of racial bias:

> [I]t was appropriate to ask the jury to consider was the questions directed by Officer Kramer to the white teen, Nicholas Cramer. The officer asked Cramer whether he knew the two black teens, whether they were actually his friends, and how long he had known them. No comparable questions were asked of the black plaintiffs. Instead, Kramer asked Price and Mason, the two African American teens "What are you doing out here?" The officer also told Mason "You're not supposed to be here." In leaving, the officers' last words to the boys were, "Get the hell out of here." The plaintiffs' counsel appropriately introduced testimony to prove these facts and, on that basis, appropriately urged the jury to draw the inference that the officers had acted on racial bias.

*Id.*

Accordingly, the Court holds that there is no genuine dispute that there is insufficient evidence to support a claim of racial profiling. The Court emphasizes that it is making this ruling at the summary judgment phase, and not at the 12(b)(6) phase. As Judge Reinhardt noted in his concurrence in *Bingham*, the task of marshaling facts at the 12(b)(6) phase to state a plausible claim of racial profiling is no easy task, especially when the plaintiff has limited access to inside information. The plausibility standard of *Twombly*/*Iqbal* should be applied at the 12(b)(6) phase with those practicalities in mind. Here, however, Ms. Brown is at the summary judgment stage of proceedings. To survive a summary judgment challenge, Ms. Brown must present some other evidence of, *e.g.*, stops of other Black motorists without probable cause or some other indication

11

of racial profiling by the Crescent City police in other contexts. The record here does not suffice. The City Defendants are therefore granted summary judgment on the claim.

C.     *Monell* Claim and/or Supervisory Claim

Defendants' second argument is that the *Monell* claim (against the City/CCPD) and/or the supervisory claims (against the individual defendants) should be dismissed because there is no genuine dispute that there is insufficient evidence to support these claims.

With respect to the *Monell* claim, the Court first takes note that the claim is properly brought against the City/CCPD only. To the extent Ms. Brown suggests she has a *Monell* claim against the individual defendants, that is not legally possible, *see Guillory v. Orange County*, 731 F.2d 1379, 1382 (9th Cir. 1984) ("*Monell* does not concern liability of individuals acting under color of state law."); *Burns v. City of Concord*, No. C 14-00535 LB, 2014 U.S. Dist. LEXIS 158119, at \*51-52 (N.D. Cal. Nov. 6, 2014 (dismissing a *Monell* claim brought against a district attorney in his individual capacity); at most, Ms. Brown would have a supervisory claim.

For the City/CCPD to be held liable under *Monell*, Ms. Brown must show that the City had an official policy or a longstanding practice or custom to, *e.g.*, conduct traffic stops without probable cause. *See Gordon v. Cty of Orange*, 6 F.4th 961, 973-74 (9th Cir. 2021). Alternatively, Ms. Brown would need to show that "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 974 (internal quotation marks omitted).

In her opposition, Ms. Brown seems to argue that there is a longstanding practice or custom of unconstitutional conduct on the part of the City:

> Plaintiff ALICE BROWN has presented evidence here that she lives in a mostly white community, Crescent City, California, and that she is routinely pulled over by law enforcement due to her race, based on unlawful pretexts, absent any real probable cause, to harass her, and this harassment includes multiple efforts by officers to run her vehicle license plates through their computer database system to see if she has any wants or warrants, that these traffic stops universally show no wants or warrants and that she is released with a warning. Ms. BROWN became so sick of these "sundown town" racist law enforcement practices, she brought a federal civil rights lawsuit.

12

Opp'n at 7-8. The problem for Ms. Brown, as noted above, is that she has not provided sufficient evidence of a longstanding practice or custom of racial profiling. In her deposition, she referred to having been previously stopped three or four times followed by a warrant check. *See, e.g.*, Brown Depo. at 18 ("The contacts I've had with the police is when I've been parked, completely still with the vehicle turned off. . . . It happened maybe three, four times, and at that time I couldn't have remember if it was Officer Miller or not."). But nothing about the circumstances of these stops is provided in the record. There is no evidence that these stops were the product of racial profiling.

As for the individual defendants, a supervisory claim would be possible only as to Mr. Wier (the City Manager) and Mr. Minsal (the Chief of Police). A supervisory claim is not possible against Officer Miller because he is not a supervisor.[4]

For supervisory liability, there must have been wrongdoing by a supervisor herself. A supervisor cannot be held vicariously liable for wrongdoing by a subordinate; rather, a supervisor must have been personally involved in the constitutional deprivation or there must otherwise be a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *See Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). Thus, *e.g.*, "'[a] supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others.'" *Id.* at 1208. In the instant case, Ms. Brown has cited to no specific action or inaction on the part of Mr. Wier (the City Manager) or Mr. Minsal (the Chief of Police).

The Court therefore grants summary judgment to the City/CCPD on the *Monell* claim and to Mr. Wier and Mr. Minsal on the supervisory claims.

///

///

///

---

[4] Defendants are not challenging the claim that Ms. Brown has against Officer Miller for an illegal traffic stop, *i.e.*, one lacking in probable cause or reasonable suspicion. Confusingly, both parties discuss in their papers whether Officer Miller had a *practice* of making illegal traffic stops. *See, e.g.*, Mot. at 12; Opp'n at 8.

### III. CONCLUSION

For the foregoing reasons, the Court grants the motion for summary judgment in its entirety. This leaves only claims against Officer Miller (but not a racial profiling claim).

This order disposes of Docket No. 103.

**IT IS SO ORDERED**.

Dated: November 9, 2021

_____
EDWARD M. CHEN
United States District Judge

14